## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAL DUSZAK, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EDWARD ABRAHAM ROSENMAN, | ) | |
| WAKISHA ROSENMAN a/k/a WAKISHA | ) | 0 7 - 0 0 9 |
| NICOLAS, FIRST GUARDIAN | ) | |
| FINANCIAL CORPORATION, | ) | |
| TRAFALGAR LEASING & FINANCE | ) | |
| CORPORATION, COSMOS GROUP, | ) | |
| WINDSOR CAPITAL LTD., FAUZIE | ) | |
| MOHAMED a/k/a FAUZIE MOHAMAED, | ) | |
| "JOHN" LNU, JOHN DOES 1-100, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

AND NOW, Plaintiff Mal Duszak, avers and states the following as a Complaint

against the defendants:

### *parties*

1.  The plaintiff is Mal Duszak ("Duszak"). Duszak resides at ul. Chopina,

    Elblag, Poland. For the purpose of this action, pleadings and documents

    may be served on Duszak at 613 Cross Street, East McKeesport, PA

    15035.

2.  The first defendant is Edward Abraham Rosenman ("Rosenman").

    Rosenman purports to be the President of First Guardian Financial

    Group, Inc., a Delaware corporation. Based on information, Rosenman

    resides at 2827 S.W/ 30th Street, Cape Coral, FL 33914 or at 15360

    Sonoma Drive, Apartment 105, Fort Myers, FL 33908.

3. The second defendant is Wakisha Rosenman a/k/a Wakisha Nicolas ("Nicolas"). Based on information, Nicholas resides at 2827 S.W. 30th Street, Cape Coral, FL 33914 and/or 15360 Sonoma Drive, Apartment 105, Fort Myers, FL 33908.

4. The third defendant is First Guardian Financial Corporation ("FGFC"), a Delaware corporation, which lists its registered office at 800 Delaware Avenue, Wilmington, DE 19801.

5. The fourth defendant is Trafalgar Leasing & Financial Corporation ("TLFC"), which purports to be a "division" of FGFC.

6. The fifth defendant is the Cosmos Group, an entity operating in New York.

7. The sixth defendant is Windsor Capital Ltd. ("Windsor"), purportedly a company owned by FGFC.

8. The seventh defendant is Fauzie Mohamed a/k/a Fauzie Mohamaed.

9. The eighth defendant is "John" LNU. "John" purports to be FGFC's officer in charge of investor relations.

10. The remaining defendants are John Does 1 through 100 who are presently unknown to the plaintiff and will be substituted as their identities are learned. John Does 1-100 consist of the alleged directors of FGFC, those actually in control of FGFC including its preferred shareholders, and persons unknown that have caused the actions alleged herein to occur.

*Jurisdiction*

11. The primary claims in this lawsuit arise under and pursuant to Sections 10(b) and 20(a) of the *Exchange Act*, (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated by the United States Securities and Exchange Commission ("SEC") thereunder (17 C.F.R. §240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the *Exchange Act*, 15 USC §78aa, and 28 USC §1331.

13. Additionally, this Court has jurisdiction over Duszak's claims for violations of the federal *Racketeer Influenced and Corrupt Organizations Act* ("Civil RICO"), 18 USC §§1961, *et seq.*, under 18 USC §§1964(a) and 1964(c), and 28 USC §§1331 and 1337.

14. This Court has supplemental jurisdiction over the state claims pursuant to 28 USC §1367.

15. Venue is proper in this District pursuant to Section 27 of the *Exchange Act*, 15 U.S.C. §78aa and 28 USC §1391(b). FGFC is a Delaware corporation, and the defendants are the principles and control persons of the corporation. The filings with the Secretary of the State of Delaware occurred in this District. Many of the acts and transactions alleged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District as the press releases targeted the State of Delaware and elsewhere. Additionally, FGFC maintains a registered agent in this District.

16. Venue is also proper in this District pursuant to 18 USC §1965(a) in that the defendants have appointed a registered agent for their enterprise in the State of Delaware. Additionally, pursuant to 18 USC §1965(b), venue is proper in that fairness requires that the defendants be brought before this Court when they have used the vehicle of an enterprise based in Delaware for their RICO operation.

17. In connection with the acts, conduct, and other wrongs alleged in this complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone and telefacsimile communications, and interstate email communications.

### The scheme

18. The defendants confederated and orchestrate a scheme to defraud using interstate commerce whereby they would issue or cause to be issued various press releases, public relations announcements, and internet publications touting various exaggerated, false, misleading, or deceptive claims of the progress of the company's activities.

19. The purpose of the press releases was to artificially inflate the market price of FGFC's shares and/or to keep the price of the FGFC stock stable as the defendants, their agents, and nominees, issued and dumped shares of common stock onto the open market.

### *The issuance of counterfeit or unlawful shares*

20. In July 2006, in an effort to further increase the cost and value of FGFC's publicly traded shares, the defendants filed an amendment to their Articles of Incorporation reducing the authorized number of shares of common stock to 152,000,000.

21. As demonstrated below, the defendants promptly announced the reduction to the public.

22. Notwithstanding the defendants' inability to legally issue shares in excess of those authorized by the Articles of Incorporation, as amended, from July through December 2006, the defendants, their agents, or nominees issued in excess of 100,000,000 shares of common stock in excess of that authorized.

23. As of December 31, 2006, FGFC had over 270,000,000 shares of common stock issued and outstanding all while having a maximum number of shares of 152,000,000.

24. The issued shares in excess of the authorized amount, although they should have been restricted pursuant to federal law, ended up on publicly traded markets.

25. Based on information and belief, the share issuances included, but are not limited to, 25,000,000 shares between September 5 and October 3, 2006, 10,000,000 shares between October 3 and October 18, 2006, 5,000,000 shares between October 18 and October 24, 2006, 13,000,000 shares between October 24 and November 7, 2006, 8,000,000 shares on

or about November 8, 2006, 20,000,000 shares on or around November 10, 2006, 20,000,000 shares between November 11 and November 20, 2006, 5,000,000 shares on or about November 21, 2006, 5,000,000 shares between December 15 and December 20, 2006, and 5,000,000 shares between December 20 and December 26, 2006.

### *The Duszak share purchases*

26. Based on, and in reliance of, the press releases, website information, and representations by the defendants, Plaintiff Duszak made various share purchased of FGFC stock on the open market.

27. On June 20, 2006, Duszak purchased 200,000 shares of FGFC on the open market for $.015 per share, or $3,000.

28. On June 20, 2006, Duszak purchased 300,000 shares of FGFC on the open market for $.014 per share, or $4,200.

29. On August 9, 2006, Duszak purchased 100,000 shares of FGFC on the open market for $.0127 per share, or $1275.00.

30. On August 18, 2006, Duszak purchased 35,000 shares of FGFC on the open market for $.0141, or $506.

31. On August 23, 2006, Duszak purchased 65,000 shares of FGFC on the open market for $.0141, or $916.

32. On August 23, 2006, Duszak purchased 300,000 shares of FGFC on the open market for $.0140 per share, or $4200.

33. On August 23, 2006, Duszak purchased 100,000 shares of FGFC on the open market for $.0140 per share, or $1400.

34. On August 23, 2006, Duszak purchased 100,000 shares of FGFC on the open market for $.0140 per share, or $1400.

35. On August 29, 2006, Duszak purchased 100,000 shares of FGFC on the open market for $.0165 per share, or $1650.

36. On August 29, 2006, Duszak purchased 50,000 shares of FGFC on the open market for $0165 per share, or $825.

37. On September 1, 2006, Duszak purchased 500,000 shares of FGFC on the open market for $.0151 per share or $7550.

38. On September 11, 2006, Duszak purchased 300,000 shares of FGFC on the open market for $.015 per share, or $4500.

39. On September 18, 2006, Duszak purchased 100,000 shares of FGFC on the open market for $.012 per share, or $1200.

40. On September 18, 2006, Duszak purchased 60,000 shares of FGFC on the open market for $.012 per share, or $720.

41. On September 22, 2006, Duszak purchased 10,000 shares of FGFC on the open market for $.011 per share, or $110.

42. On October 3, 2006, Duszak purchased 150,000 shares of FGFC on the open market for $.0101, or $1515.00.

43. On October 4, 2006, Duszak purchased 100,000 shares of FGFC on the open market for $.0095 per share, or $950.

44. In all, Duszak bought approximately 2,570,000 shares of FGFC for $35,907.

45. All of the above transactions were completed based on Duszak's reliance on the claims made by the company in its paid press releases and on its internet websites.

***Companies that the defendants retained to artificially inflate the value of its shares***

46. The defendants, their agents, and their nominees retained several companies in the course of attempting to artificially inflate the value of FGFC's stock.

47. The defendants, their agents, and their nominees paid the companies in FGFC stock and/or in cash all while claiming to be attempting to reduce the number of shares available to the public.

48. The defendants, their agents, and their nominees retained Business Wire, a press release distribution service, to distribute myriad misleading press releases touting the alleged achievements of FGFC.

49. The defendants, their agents, and their nominees retained Stockwire, which accepts compensation in shares of the company's stock, to issue misleading and deceptive "Stockumentaries" about FGFC.

50. The defendants, their agents, and their nominees retained Iron Consulting LLC, controllers of growthstockresearch.com and growthstockalert.com, which accepts compensation in the form of cash and/or shares of the company's stock, to issue misleading and deceptive reports about FGFC.

*Some of the FGFC Misleading, False, and Deceptive Press Releases*

51. On February 21, 2006, the defendants issued a press release usng
    Business Wire announcing that FGFC named "E. Abraham Rosenman"
    as its new President and "COO." The press release claimed that, "Mr.
    Rosenman was recruited from outside the company to lend fresh ideas
    and direction to the company's growth, objectives and business plan
    going forward, and has the Board's full support for his ideas and
    strategies." The press release deceptively concealed that, contrary to
    being recruited from outside the company, Edward Abraham Rosenman
    was actually a restaurant manager for IBAC Corporation, controlled by
    Edward Hayter, who previously owned FGFC's corporate shell and
    operated it under the name Viyon Corporation. Indeed, Defendant
    Rosenman's primary source of income is his job running Mr.
    Hayter/IBAC's restaurant located in Florida.

52. Immediately after issuing the press release identifying the President of
    FGFC as "E. Abraham Rosenman," and in a further effort to confuse the
    public, the defendants began referring to Defendant Rosenman as
    "Abraham Rosenman." Subsequent investigation and discussion with
    Defendant Rosenman's coworkers revealed that he is not known by his
    middle name, but is known as "Edward Rosenman."

53. On June 8, 2006, the defendants issued a press release using Business
    Wire announcing it intended to purchase up to 25,000,000 shares, "thus
    further reducing the company's outstanding/float to 53,331,916 shares."

The press release claimed that, "This directive reflects the continued commitment of First Guarding Financial Corporations management and Board of Directors to reduce the outstanding/float and restrict any dilution while creating maximum value for our current and future shareholders." The press release claimed that Defendant Rosenman said, "The Board of Directors has directed me to reduce the outstanding/float shares as much as I can to a pre forward split price of at least .90 to 1.00 per share, given this task I will continue to seek opportunities to reduce the outstanding/float shares as much as possible, while creating/increased revenues and value for the company." The purpose of this press release was to convince the public that FGFC intended to reduce its outstanding shares, increasing the value of the remaining shares. However, the defendants knew, or should have known, that it had no intent of reducing the share counts to 25 million shares or actually buying back shares on the open market. On the contrary, the defendants' plan and scheme involved issuing additional shares during the time periods that it claimed it was reducing shares. The defendants also knew, or should have known, that a promised $.90 per share value, whether preforward split[1] or not, was not feasible absent FGFC actually taking the actions it implied it would do and being successful with those actions.

---

[1] FGFC had a forward split in April 2006 of 11 shares for every 1 share owned. The use of "pre forward split" valuations was meant to confuse investors.

54. On or about June 13, 2006, the defendants issued a press release using
Business Wire claiming that FGFC's Board of Directors adopted a
resolution to further reduce its outstanding shares by 20 million shares.
FGFC claimed in the release that, "The reduction will be above and
beyond the previously announced projected buyback plan of 25 million
common shares as previously announced the plan calls for the company
to pay up to 0.06 cents per share on the open stock market.  The press
release further stated that the "company believes in its future very
strongly and at that level (the company believes) it is at least 40% below
value (pre forward split levels).  The press release quoted Defendant
Rosenman as saying, "This resolution reflects the commitment of First
Guardian Financial Corporations management and Board of Directors to
restore and build value for our current and future shareholders.  The
company would like to reduce the common shares outstanding to no
more than 15 to 20 million shares; in conjunction with its reduction plan,
the company is also working diligently on obtaining audited financial
statements for its desired more to the OTCBB."  The purpose of this
press release was to convince the public that FGFC intended to reduce
its outstanding shares, increasing the value of the remaining shares.
However, the defendants knew, or should have known, that it had no
intent of reducing the share counts to 15 million shares or actually
buying back shares on the open market.  On the contrary, the

defendants' plan and scheme involved issuing additional shares during the time periods that it claimed it was reducing shares.

55. On June 15, 2006, the defendants paid or issued shares to the Bellwether Report to release misleading, exaggerated, and deceptive claims that: (1) FGFC is one of the first companies to interface with online games and player tracking systems found on traditional floor slot machines when it does not have the capability to perform such an interface; (2) FGFC adopted a resolution on June 12, 2006, to reduce the Company's outstanding shares of common stock by another 20 million shares when the Company's true plan was to increase its outstanding stock; (3) FGFC is diligently working on obtaining audited financial statements for its desired move to the OTCBB when said financial statements were not being obtained; (4) FGFC had Alliance Financial Services "under retainer" to provide acquisition and/or merger funding via self liquidating zero coupon bonds which would provide "another valuable source of financing for further growth without diluting the company's shares" when the defendants knew that no real financing would come from it's alleged retainer with Alliance Financial Services[2]; (5) FGFC directed their President to "reduce the outstanding/float shares as much as [he] can to a pre forward split prince of at least .90 to 1.00 per shares" and that he would "continue to seek opportunities to reduce the outstanding/float shares as much as possible, while creating/increased

---

[2] The defendants appeared to lift the name Alliance Financial Services from a real company that specializes in annuities. It is unclear whether the defendants actually formed such a company to further their scheme or whether they just used the name to make it appear as if their claims were legitimate.

revenues and value for the company" when the defendants knew that their plan was to increase the number of shares and to sell those shares through nominees on the open market at a profit; (6) FGFC began the process of exploring and developing a merchant credit card processing service when no such exploration was taking place; (7) FGFC's foresees a network of offices in major cities across the country staffed with local knowledgeable professionals generating business from their communities augmented buy [buy] leads from the company's soon to be launched buysellmerge.com business portal when the defendants knew that there were no feasible plans for a nationwide network of offices.

56. On June 20, 2006, the defendants issued a press release using Business Wire that claimed that FGFC "completed the reduction of its authorized shares to 200 million total." The press release further claimed that the company budgeted $3,000,000 to buyback up to 50 million shares at a maximum price of .06 per share, thus reducing the company's capitalization to 150 million shares. However, the defendants concealed that at no time did the company have $3,000,000 in cash available to purchase 50,000,000 shares.

57. On June 21, 2006, the defendants issued a press release using Business Wire claiming that FGFC agreed to a joint venture that will acquire a 50 acre parcel in Ontario, Canada. The press release claimed that FGFC would be a 51% partner. The press release asserted that the 50 acres would be used for the development of a "hotel/casino" project. FGFC

concealed, however, that in order to construct a casino, the Ontario

governmental lottery unit must be a participant and that FGFC never had

any contact with the Canadian authorities.

58. On September 14, 2006, the defendants issued a press release using

Business Wire claiming, *inter alia*, that it was actively lending money

through its Windsor Capital Unit. The press release further claimed that

the Company has several million dollars lent (in its portfolio) at this time

and "we will be continuing to increase that amount aggressively." The

defendants concealed, however, that its alleged loans were only paper

loans to affiliated enterprises meant to make it appear that the alleged

loans existed. The press release further claimed that, "The company's

Trafalgar Leasing unit is in the process of getting underway with

securing a 50 million dollar warehouse line of credit, infrastructure to

service the leases (collect payments, etc.) either in house or outsourced

and putting together our marketing team, we anticipate this unit to be

producing revenues within the next two months or so." However, the

defendants concealed that they did not have a true line of credit valued at

50 million dollars. If anything, the company merely had documents

made by the defendants and their nominees to make it appear as though

a line of credit existed. The press release further claimed that its

buyback of shares on the open market was on going." This statement

was included to give the impression that the shares would be reduced

when, in reality, the company was issuing shares or preparing to issue

more shares. The press release made claims that it is "working on its audited financial statements and expects to have them by the end of the year." The press release inferred that its "land flip" deal would "bolster" the financial statements "as we feel with the anticipated low float after the buy back will give the company better credibility when we file to trade on the OTCBB." The purpose of these statements was to convince shareholders that the company would move from the "Pink Sheets" to the Over the Counter Bulletin Board operated by the National Association of Securities Dealers Automatic Quotation service, which increases the value and credibility of the company. However, the defendants knew that they were not truly working on an audit. Finally, the press release claimed that Defendant Rosenman stated, "I would like to address certain references to Mr. Hayter, he is not associated with out company as certain shareholders have eluded to we bought his shares out and the only involvement he did have was that he sold us the company (shell) and that is it." However, the press release concealed that Defendant Rosenman's primary source of income was his job as a manager of a restaurant owned by IBAC Corporation, whose principle was Edward Hayter. In other words, Defendant Rosenman, while making million dollar land deals, working with a 50 million dollar line of credit, brokering loans, and creating business web portals, worked for a restaurant for Hayter's company.

59. On September 28, 2006, the defendants issued a press release using Business Wire claiming that FGFC agreed to sell its Canadian Land Contract giving it a profit of over $1,173,000 Canadian. However, based on information, any alleged sale was intended to be a paper transaction that would not result in any cash to FGFC.

60. On October 4, 2006, the defendants issued a press release using Business Wire claiming that FGFC was to be an "arranger/lender of a $100,000,000 acquisition and redevelopment finance package for a major retail/commercial/office development project." The press release claimed that FGFC expected to receive revenue from this deal in the form of a fee (percentage of the loan amount) income and loan servicing fees. The press release was deceptive in that the defendants knew, or should have know, that no real $100,000,000 acquisition was taking place, or if it was, it was a paper transaction that would not provide any cash revenues to FGFC. The purpose of the press release was to artificially inflate the value of FGFC and the scope of its business activities.

61. On October 16, 2006, the defendants issued a press release using Business Wire claiming that FGFC ordered a list of non-objecting beneficial owners of its stock. The press release contained statements attributed to Defendant Rosenman that, "Our primary interest is to have the least amount of shares outstanding as we move towards the OTBBB…." The press release claimed that, "It seems to be that there

may be some possible discrepancies and we want to be completely sure

that our records are 100% accurate." The defendants issued the release

to give shareholders the false impression that the reduction in share price

may be attributed to "short sellers" and that FGFC was continuing to

reduce its share count. However, during the material times, FGFC was

indeed increasing the number of shares outstanding rather than

decreasing them.

62. On October 18, 2006, the defendants issued a press release using

Business Wire claiming that FGFC completed the sale of its interest in

the Canadian land contract. The press release claimed that FGFC

received $1,139,000 for its interest. Defendant Rosenman was quoted as

saying that, "We are very pleased with this wind fall as it will bolster our

Balance Sheet, the company is in the process of negotiating other similar

type deals, where we tie up desirable real estate and then sell (flip) our

interest in the contract as this is highly profitable with the right deals."

The press release was false and deceptive in that FGFC did not actually

receive $1,139,000, except possible on paper with no cash changing

hands. Furthermore, based on information, no similar deals were being

negotiated except possibly on paper with affiliated or created

enterprises.

63. On October 25, 2006, the defendants issued a press release using

Business Wire claiming that FGFC agreed to acquire "Nationwide RE

for Sale." The press release claimed that "Nationwide RE for Sale" was

a "real estate listing service (currently with 600 million dollars of real estate listed) on the internet that is sponsored by advertisers and also receives revenue from premium subscribers."  The press release was misleading in that FGFC concealed that they simply bought an internet domain which had a prepackaged real estate listing service on it for $1,300, FGFC concealed the fact that there was no company and no real estate listing service, but that anyone can buy a similar site for approximately $100.  FGFC concealed that, prior to purchasing the internet domain name and prepackaged software, the site "Nationwide RE for Sale" had no revenues and no customers.  FGFC concealed the fact that the listings on the site were not exclusive, but were available to anyone buying the $99 website service.

64. On November 2, 2006, the defendants issued a press release using Business Wire claiming that FGFC retired the first block of 100,000,000 shares.  (These shares were restricted shares that were obtained when Edward Hayter sold the corporate shell to the new owners).  While FGFC did retire the restricted shares, it concealed the fact that, at the same time, it was issuing new shares that found their way onto the public market.  The press release quoted Defendant Rosenman as claiming that the buyback of FGFC shares on the public markets "has not gone as fast as we anticipated as the lack of volume has not allowed us the ability to acquire the shares that we would like on the open market as fast as we thought; however, we will get it done very soon."  The

statement was deceptive in that the company was not buying back shares, but issuing new ones. The purpose of the release was to provide investors confidence in FGFC.

### FGFC Investor Relations' representations

65. On September 14, 2006, a person identifying himself as "John" from FGFC's Investor Relations department called the plaintiff's agent, Michael Sussman, and represented that Defendant Rosenman was extremely conservative, was taking actions to reduce the share count as much as possible, and was working full time on FGFC's businesses and on the company's financial audit in an effort to move the stock to the NASDAQ bulletin board.

66. Defendant John LNU asserted that neither FGFC nor Defendant Rosenman had any remaining business relationship with Edward Hayter, the former control person of FGFC when it was known as Viyon Corporation.

67. Defendant John LNU concealed the fact that FGFC was issuing shares while claiming that it was reducing shares.

68. Defendant John LNU concealed the fact that Defendant Rosenman worked full time as a restaurant manager for Edward Hayter's company, IBAC Corporation, and that Mr. Hayter was his supervisor and had the power to terminate his position.

### *Misleading claims on FGFC's website*

69. In an effort to make it appear that FGFC had a legitimate operation, the defendants created a website at www.guardianfinancialcorporation.com .

70. The website falsely claimed that Defendant Rosenman, the President and CEO, "has been successfully involved in ownership/investment interests and the financing of a broad mix of businesses across the country." The site further claims that Defendant Rosenman was, "Well known for his ability as a business strategist, investor, and consultant to multi million dollar operations…" The website concealed that Defendant Rosenman's primary source of income was managing a restaurant for IBAC Corporation. The website claimed that Defendant Rosenman, "Possessing [sic] the experience and skill to successfully invest in and develop start-ups as well as established companies various developmental stages." The website averred that, "For the last several years, Mr. Rosenman had been primarily involved in his company overseeing its investments."

71. The defendants published a "Code of Ethics" on their website in an effort to provide investors with a false sense of reassurance that FGFC was a legitimate operation. The Code of Ethics claimed that, "In all of our business practices, we are committed to doing the right thing." The Code of Ethics claimed that, "First Guardians directors, officers and employees are required to comply with all applicable laws, rules, and regulations." This claim was false and known to be false and the

defendants knowingly and willingly issued shares of common stock in excess of its authorized amount all while knowing that such an action

**COUNT I** – *Violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all defendants*

72. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth again.

73. During the relevant period, defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the time period, did: (i) deceive the investing public, including plaintiff, as alleged herein; and (ii) cause plaintiff and others to purchase Brantley securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, defendants, and each of them, took the actions set forth herein.

74. Defendants (a) employed devices, schemes, and artifices to defraud, (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of FGFC's securities in an effort to maintain artificially high market prices for FGFC securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

75. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the

mails, engaged and participated in a continuous course of conduct to
conceal adverse material information about the business, operations, and
future prospects of Brantley as specified herein.

76. Defendants employed devices, schemes, and artifices to defraud, while
in possession of material adverse non-public information and engaged in
acts, practices, and a course of conduct as alleged herein in an effort to
assure investors of FGFC value and performance and continued
substantial growth, which included the making of, or the participation in
the making of, untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made about
FGFC and its business operations, asset levels, and future prospects in
the light of the circumstances under which they were made, not
misleading, as set forth more particularly herein, and engaged in
transactions, practices and a course of business which operated as a
fraud and deceit upon the purchasers of FGFC securities during the
period that the plaintiff purchased shares.

77. Each individual defendant's primary liability, and controlling person
liability, arises from the following facts: (i) the individual defendants
were high-level executives, control persons, and/or directors for FGFC
during the share purchase period and members of FGFC's management
team or had control thereof;  (ii) each of these defendants, by virtue of
his or her responsibilities and activities as a senior officer and/or director
of FGFC was privy to and participated in the creation, development, and

reporting of FGFC's internal budgets, plans, projections, and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of FGFC's management team, internal reports, and other data and information about Brantley's finances, operations, and sales at all relevant times; and  (iv) each of these defendants was aware of FGFC's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

78. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FGFC's operating condition from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' gross exaggerations and misstatements of FGFC's business, operations, and earnings throughout the period when the shares were issued and before, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

79. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of FGFC's securities was artificially inflated during the purchase period.  In ignorance of the fact that market prices of FGFC's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the purchase period and before, plaintiff and the others acquired FGFC securities during the period at artificially high prices and were damaged thereby.

80. At the time of such misrepresentations and omissions, plaintiff and others were ignorant of their falsity, and believed them to be true.  Had plaintiff known the truth regarding the problems that FGFC was experiencing, and the true nature of FGFC's business operations, which were not disclosed by defendants, plaintiff would not have purchased or otherwise acquired FGFC's securities, or would have sold them prior to the price plummeting as a result of the defendants' dilution of shares.

81. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

82. As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered damages in connection with their respective purchases of FGFC's securities during the relevant period.

**COUNT II –** *Violation of Section 20(a) of the Exchange Act against the individual defendants*

83. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84. The individual defendants acted as controlling persons of FGFC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of FGFC's operations and/or intimate knowledge of the false information disseminated to the investing public, the individual defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of FGFC, including the content and dissemination of the various statements which plaintiff contend are false and misleading. The individual defendants were provided with or had unlimited access to copies of FGFC's reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

85. In particular, each of the individual defendants had direct and supervisory involvement in the day-to-day operations of FGFC and, therefore, is presumed to have had the power to control or influence the

particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

86. As set forth above, FGFC and the individual defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the individual defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered damages in connection with their purchases of FGFC's securities during the relevant period.

**COUNT III – Conducting the affairs of the corrupt enterprise in violation of 18 USC §1962**

87. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth again.

88. FGFC constitutes an enterprise within the meaning of 18 USC §1961(4).

89. As an integral part of the continuing conspiracy and course of conduct described above, the defendants and others repeatedly and continuously used and affected the instrumentalities of interstate commerce, including the mails, wires, overnight delivery services, air travel, and other forms of interstate commerce in the United States within the meaning of 18 USC §1962.

90. The defendants' conduct, acts, and omissions were an integral part of the overall pattern and practices described in this Complaint, including using the facilities of United States interstate commerce for their scheme to defraud the plaintiff and other investors.

91. Each press release identified in ¶¶51-64 above constitutes a violation of 15 USC §78j(b) as the defendants employed manipulative or deceptive device or contrivance in contravention of rules and regulations as the Securities and Exchange Commission prescribed, and, as a result, constitutes racketeering activity as defined by 18 USC §1961(1).

92. Each issuance of shares in excess of the authorized amount established by the articles of incorporation, all during a period when FGFC was supposedly reducing its available shares, constitutes a violation of 15 USC §78j(b) as the defendants employed manipulative or deceptive device or contrivance in contravention of rules and regulations as the Securities and Exchange Commission prescribed, and, as a result, constitutes racketeering activity as defined by 18 USC §1961(1). Based on information and belief, at least ten issuances of shares occurred during the relevant period.

93. Each press release identified in ¶¶51-64 above constitutes a willful violation of the rules and regulations governing securities in violation of 15 USC §78ff as the defendants employed manipulative or deceptive device or contrivance in contravention of rules and regulations as the Securities and Exchange Commission prescribed, and, as a result, constitutes racketeering activity as defined by 18 USC §1961(1).

94. Each issuance of shares in excess of the authorized amount established by the articles of incorporation, all during a period when FGFC was supposedly reducing its available shares, constitutes a contravention of

the rules and regulations governing securities  15 USC §78j(b) as the defendants employed manipulative or deceptive device or contrivance in contravention of rules and regulations as the Securities and Exchange Commission prescribed, and, as a result, constitutes racketeering activity as defined by 18 USC §1961(1).  Based on information and belief, at least ten issuances of shares occurred during the relevant period.

95. Each issuance of shares in excess of the authorized amount involved the fraudulent use of interstate wires or mails to transmit the instructions to Computershare, FGFC's transfer agent, in violation of 18 USC §§1341 and/or 1343 and, as a result, constitutes racketeering activity as defined by 18 USC §1961(1).

96. Each issuance of a press release through Business Wire as described above involved the fraudulent use of interstate wire in violation of 18 USC §1343 and, as a result, constitutes racketeering activity as defined by 18 USC §1961(1).

97. Each of the above acts played an integral part and result of this conduct and these acts and omissions intended to deprive the plaintiff and others of their assets.

98. All of these acts constitute RICO "predicate acts" under 18 USC §1961, and were intended to, and did deprive the plaintiff and others of assets and money.

99. The conduct of the defendants and/or others involved substantially more than "at least two acts of racketeering activity … the last of which

occurred within ten years after the commission of a prior act of racketeering activity" and therefore constitute a "pattern of racketeering" within the meaning of 18 USC §1961(b).

100.  As set forth above, this pattern consisted of repeated, continuous acts that had the same or similar purposes, results, participants, victims, or methods of commission, and are interrelated by distinguishing characteristics rather than isolated events.

101.  It was the purpose of the pattern and practice to deprive the plaintiff and the investor public of their money and assets through a pattern of fraudulent conduct.

102.  The defendants repeatedly engaged in acts indictable under the aforementioned laws and took place in interstate commerce and, thereby, the defendants continually engaged in "racketeering activity" within the meaning of 18 USC §1961(1)(B).

103.  The repeated violations of federal law by the defendants extended over a period of one year and involved distinct and independent criminal acts. They were neither isolated nor sporadic events, but involved the regular and repeated violations of law to accomplish their desired ends in the court of the continuing business of FGFC.

104.  These acts were related to each other by virtue of (a) common participants, (b) common victims, (c) common methods of commission, and (d) a common purpose and common result.

105. As such, this conduct constitutes a pattern of racketeering activity within the meaning of 18 USC §1961(5).

106. These repeated and continuing violations of the provisions of 18 USC §1961(5) cited above were neither isolated nor sporadic events, but involved a callous and calculated series of repeated and systematic violations of law in order to conceal and promote criminal activity in the course of the continuing business of FGFC. These activities therefore constitute a further component of a pattern of racketeering activity within the meaning of 18 USC §1961(5).

107. These violations of 18 USC §1962(d) caused the plaintiff to suffer direct injury to the property rights possessed and to the value of the property.

108. The defendants engaged in the conduct, acts, and omissions described above willfully and with actual knowledge of their illegality and actual purpose to the detriment of investors including the plaintiff.

**COUNT IV – *Conspiring to conduct the affairs of the racketeer enterprise in violation of 18 USC §1962(d)***

109. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth again.

110. By their conduct, acts, and omissions set forth in detail above, during the times material, the defendants and/or others agreed to manage, operate, conduct, and participate in the conduct of the affairs of FGFC through a pattern of racketeering activity within the meaning of 18 USC §1962(d).

111. The defendants, being persons intimately involved in the transactions and affairs of FGFC unlawfully and willfully combined, conspired,

confederated, and agreed with each other to violate 18 USC §1962©,

that is, to conduct and participate, directly or indirectly, in the conduct of

the affairs of FGFC through a pattern of racketeering activity, all in

violation of 18 USC §1962(d).

112. Part of this conspiracy was that the defendants and/or others committed

and agreed to commit two or more (and numerous) repeated fraudulent

and illegal racketeering acts and conducted and agreed to conduct the

affairs of FGFC through the pattern of racketeering activity in violation

of 18 USC §1962(c) described above.

113. In furtherance of the conspiracy and to effect the objects thereof, the

defendants and/or others committed and caused to be committed a series

of over acts, including those specifically alleged in the paragraphs

above.

114. The plaintiff has been directly injured and suffered a financial loss by

reasons of the violations of 18 USC §1962(d). The losses, in an amount

to be proven at trial, were the direct result of the conspiracy set forth

above.

### COUNT V – *Breach of fiduciary duty*

115. Plaintiff repeats and realleges each and every allegation contained above

as if fully set forth again.

116. The defendants maintained a duty of due care to the plaintiff and the

other shareholders to operate in a manner legally and consistent with its

representations and to comply with the laws of Delaware as to share issuances.

117. The defendants breached their duty of due care by issuing false press releases, exhausting thousands of dollars in resources for the sole purpose of disseminating false information to increase the value of their stock, issuing shares in excess of the authorized amount and selling them on the public markets for their own benefit, and failing to perform the promises made in the press releases.

118. The defendants acted in a manner inconsistent with that of an ordinary, prudent person in a fiduciary position.

119. As a result of the breach of fiduciary duty, the plaintiff suffered damages as explained above.

### COUNT VI – *Fraudulent conveyance*

120. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth again.

121. The defendants created a series of entities and false and fraudulent transactions to justify the issuance of shares to third parties under their control.

122. Every share issued during the material times was counterfeit and void as it exceeded that authorized by the Delaware articles of incorporation.

123. Every share issued was done so with the intent to defraud the current investors.

124. The defendants provided instructions to their transfer agent, Computershare, to issue the shares to third parties under their control or to third parties for the purposes to furthering the fraud scheme.

125. Based on information, the shares issued to third parties were converted to cash by selling them on the open stock market through various bank and brokerage accounts in the names of third parties and entities created by the defendants.

126. The actions in transferring the shares and obtaining the funds from the sale on the open market constitute a fraudulent conveyance.

127. The sole purpose of the transactions was to hide and conceal the assets derived from the fraudulent shares.

128. As such, the plaintiff is entitled to equitable relief against the defendants and the entities that were used as vehicles to hid the funds.

WHEREFORE, based on the above, plaintiff Mal Duszak respectfully demands that this Court: (1) Award judgment in an amount to be proven at trial; (2) Award treble damages as authorized by 18 USC §1961, *et seq.*,; (3) Award punitive damages in an amount to be proven at trial; (4) Award interest and compensatory damages; (5) Issue an injunction prohibiting the defendants from the issuance of any further shares; (6) Issue an injunction requiring strict compliance with the promises and representations made in the press releases as to the buyback of shares; (7) Issue an injunction rescinding the transactions creating the additional shares; (8) Issue an injunction or writ of seizure that places the issued shares and any proceeds under the control of the Court; (9) Any further relief that is necessary and just; and (10) Award costs, fees, and attorneys fees, if any.

I, Mal Duszak, declare and state under the penalty for perjury that the allegations above are true and correct to the best of my knowledge, information, and belief.  28 USC §1746.

Respectfully submitted,

Mal Duszak
613 Cross Street
East McKeesport, PA  15035
1-888-546-2320  Telephone
1-800-572-4403  Facsimile
m.duszak@k2send.com

PLAINTIFF

JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)   PLAINTIFFS
Mal Duszak

## DEFENDANTS
First Guardian Financial Corporation, et al.

**(b)**   County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   New Castle
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**   Attorney's (Firm Name, Address, and Telephone Number)
613 Cross Street
East McKeesport PA 15035   888-

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☒ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
another district
(specify)

☐ 6   Multidistrict
Litigation

☐ 7   Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Exchange Act, section 10(b)
Brief description of cause:
Fraudulent securities case involving false press releases and exceeding auth. shares

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $
999,999,999

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   January 5, 2007

SIGNATURE OF ATTORNEY OF RECORD
*Mal Dush*

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.**  Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: 47 USC 553
                                                                Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.**  Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.**  This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.