UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

MAL DUSZAK,                                    :
                                              :
               Plaintiff,                      :
                                              :
       v.                                      :        Case No. 07cv0009
                                              :
EDWARD ABRAHAM ROSENMAN;                       :
WAKISHA ROSENMAN a/k/a WAKISHA                 :
NOCOLAS; FIRST GUARDIAN FINANCIAL             :
CORPORATION; TRAFALGAR LEASING &               :
FINANCE CORPORATION; COSMOS                    :
GROUP; WINDSOR CAPITAL, LTD.; FAUZIE          :
MOHAMED a/k/a FAUZIE MOHAMAED;                 :
"JOHN" LNU; JOHN DOES 1-100,                   :
                                              :
               Defendants.                     :

## DEFENDANTS' AMENDED OPPOSITION TO MOTION
## FOR ALTERNATIVE PROCESS

Defendants Edward Abraham Rosenman, Wakisha Rosenman a/k/a Wakisha Nocolas,

First Guardian Financial Corporation, Trafalgar Leasing & Finance Corporation, Cosmos Group,

Windsor Capital Ltd., and Fauzie Mohamed a/k/a Fauzie Mohamaed (collectively, the

"Defendants"), by and through their undersigned attorney, oppose the Plaintiff's motion pursuant

to Fed. R. Civ. P. 4(m) to allow alternative process (the "Motion").

**A.     Defendants Have Reasonable Grounds to Believe That This Purported Pro Se
        Action is Being Litigated By Plaintiff's Husband Who Is Not Licensed to Practice
        Law, and, thus, Object to Any Relief Sought by "Plaintiff"**

        1.      This Court has previously denied access to parties seeking to have non-lawyers

represent them in pending litigation. See Taylor v. Mariner Health Care Group, Inc., 2002 WL

531233 (D. Del., March 26, 2002). Indeed, as noted by the Court in Taylor, the representation of

others by non-lawyers constitutes the unauthorized practice of law. Id.

        2.      As set forth below, Defendants have reasonable grounds to believe that this

litigation is not being pursued by the purported *pro se* plaintiff, but rather by her non-lawyer husband. As such, Defendants continue to object to any relief sought by the Plaintiff in this litigation.

3.     The alleged *pro se* plaintiff lists as her coordinates for the purposes of this litigation the telephone number and mailing address of her husband, Keith Maydak, while admitting that she resides in Poland and is currently in South America, moreover, her husband is a convicted felon, a self-anointed lawyer and the author of countless harassment suits. His exploits have been covered in the press, see Exh. 1 hereto, in legal proceedings, see Exh. 2 hereto, and Maydak maintains one or more running "blogs" to which he proudly attaches his various legal pleadings in this case. See, e.g., www.kmf.org/maydak/index.html.

4.     Though he is not a member of the bar of this Court, Maydek has acted as though he represents his wife, Mal Duszak – *i.e.*, the "pro se" plaintiff. Indeed, Maydak advised Defendants' New York counsel that he represents his wife in these proceedings. In this regard, he transmitted the telefax appended hereto as Exh. 3 in which he maintained that he is authorized to speak on her behalf and that he has the power to resolve the matter for her.

5.     In the context of the instant Motion, the Plaintiff admits that Maydak has had communications with defendant Rosenman on her behalf. See Motion ¶15. Indeed, Maydak has himself acknowledged in a prior submission in the District Court for the Eastern District of New York (in opposition to a motion to quash a subpoena issued in this case from that District) that he has held himself out as the Plaintiff in contacting both parties to this action and alleged non-party witnesses. The Plaintiff submitted Maydak's own transcription of a conversation he claims to have had with one of the proposed defendants in this case while impersonating Plaintiff. See Exh. 4 hereto consisting of the first page of the alleged transcript.

6.     Additionally, during a conference call with Magistrate Judge Ramon E. Reyes, Jr.

on the same motion to quash, Plaintiff, who was participating from a hotel room in Panama City, Panama, admitted that Maydak was at her side at the time. She also admitted that what she called her "office address" is actually the address of Maydak's mother in Pennsylvania, namely 613 Cross Street East McKeesport, PA 15035. [1]

7.    Moreover, the Plaintiff has stated in papers filed in another proceeding that her husband— a person with "litigation experience"— assists her. See Exh. 5 at ¶¶ 21 and 22. In that same proceeding, Maydak submitted a declaration in which he addressed, "the majority of the cases he has recently prosecuted." See Exh. 6 at ¶ 13.

8.    Based on the foregoing, Defendants object to the Court granting any relief to Plaintiff and request that the Court hold a hearing in Wilmington, Delaware on the issue of whether plaintiff is actually proceeding *pro se*.

**B.    Defendants Object to Plaintiff's Request to Have the Court Require Defense Counsel to Accept Service**

9.    At the outset, Defendants note that the Motion itself is rife with hearsay and double hearsay, but short on genuine documentation. The Plaintiff chiefly relies upon alleged statements made to her husband by Rosenman and that her husband conveyed to her. The Plaintiff also contends that mail is being received at the defendant's home, but for some reason UPS cannot deliver packages to the house. See Motion at ¶¶ 13 and 16. No UPS documentation is supplied, however which might demonstrate these failed or aborted efforts, nor elucidate the discrepancy.

10.    At times in this case, the Plaintiff has purported to use a process service company called "ABC Agents, Inc.," an entity which also happens to be located inside Maydak's mother's home, namely 613 Cross Street East McKeesport, PA 15035. See Exh. 7 hereto, consisting of a

---

[1] And, while the Court ordered the Plaintiff to submit documents evidencing her identity and ability to file materials from overseas, it was Maydak who submitted papers.

copy of the mailing addresses for Maydak's mother and ABC Agents, Inc.

    11.    While the Plaintiff maintains that she used another and presumably genuine process server here, namely "Attorney's Subpoena Service, Inc.," she has included no documentation reflecting any attempted service by any agency, including that company.

    12.    Notwithstanding the foregoing, the Defendants have no objection to the Plaintiff's request for additional time to achieve service.

    13.    However, the Defendants —and the Rosenmans in particular—object to Plaintiff's effort to have the Court authorize alternative service.  In the first instance, Defendants' counsel is not authorized to accept service of the Complaint on their behalves.  Moreover, Plaintiff cites no authority requiring an attorney to accept service on behalf of a client.

    14.    As such, Defendants respectfully request that the Court deny Plaintiff's request for alternative service.  However, to the extent that the Court is inclined to grant the motion, the Defendants respectfully request a hearing during which this allegedly *pro se* plaintiff may herself appear and address the foregoing concerns.

    WHEREFORE, the Moving Defendants respectfully request that the Court deny the Plaintiff's motion and grant any further relief the Court deems just and proper.

                      Respectfully submitted,

                      _____

                      John C. Phillips, Jr. (Bar No. 110)
                      PHILLIPS, GOLDMAN & SPENCE, P.A.
                      1200 N. Broom Street
                      Wilmington, DE 19806
                      (302) 655-4200 (telephone)
                      (302) 655-4210 (fax)

DATE:  May 15, 2007

CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2007, a copy of the foregoing Defendants' Opposition to Motion for Alternative Process was served upon the following person(s) via facsimile and first class, postage prepaid mail:

Mal Duszak
613 Cross Street East
McKeesport, PA 15035

Fax Number:  1-800-572-4403

_____
John C. Phillips, Jr., Esquire (#110)

**EXHIBIT 1**

Brainy convict back in town

# East Neighborhoods

## Brainy convict back in town

Sunday, December 19, 2004

By Torsten Ove, Pittsburgh Post-Gazette

Keith Maydak is back in town.

After two years as a prisoner in Canada, the convicted scammer from North Versailles was extradited in October and made a fresh appearance this week in U.S. District Court, where his eccentric brilliance and propensity to sue everyone has made him a legend.

At his trial a decade ago on charges of defrauding AT&T of $550,000 in a 900-number scheme, he wore a Beavis and Butt-Head T-shirt to show his disdain for the government.

Senior U.S. District Judge Alan Bloch gave him eight years in prison and Maydak has been filing suits ever since, once even serving papers on the judge at his house.

On Thursday, he stood again before Bloch. This time, he wore standard prison orange -- and handcuffs.

Bloch ordered that Maydak, 34, be held in the Allegheny County Jail until March 7, when the judge will sentence him for violating his probation by getting arrested for drunken driving on the South Side in 2001.

He could get two years, although Maydak says he won't serve time because he has already spent two years in jail in Canada on what he insists were false obstruction and immigration charges.

"Bloch gives everyone the maximum sentence, but the Bureau of Prisons will give me credit for the time served and he knows that," he said from the Allegheny County Jail. "This [jail term] is just a stall tactic to punish me for contesting my extradition from Canada."

How he arrived back in Bloch's courtroom after all these years is a convoluted tale, as most everything is with Maydak.

"He's real smart, and the smart ones are hard to catch," said Deputy U.S. Marshal Joe Moorhead, who brought Maydak back from Vancouver.

In the brains department, Maydak is several cuts above the average federal felon.

His computer expertise is such that, during his trial in 1994, court officials shut down a public computer in the clerk's office because they had seen him typing on it and feared he might be able to hack into the system.

He files his motions and lawsuits, lots of them, himself.

He once sued a food company from prison because, he said, its olive oil container didn't have as much olive oil as the label said it did.

Claiming he was a vegan, he made national news in 2000 when he sued to get soy milk served to him in prison. He eventually won, although federal authorities pointed out that he did not seem to be adhering strictly to his diet, considering that he had recently ordered a "giant beef stick."

Brainy convict back in town

Over the years, he has sued AT&T, Assistant U.S. Attorney Paul Hull, the Justice Department and the attorney general, among many others.

He said he even sued the Pittsburgh Post-Gazette when the paper wrote in 1994 that he had hacked into Westinghouse Electric's computer system at age 17 and put himself on the payroll.

He says the paper defamed him because that never happened, but that he dropped the suit anyway.

"I kind of just let it go," he said.

### 900 fraud

What he won't let go is his insistence that Bloch conspired with the prosecution to railroad him in the AT&T case.

Federal prosecutors say he has never presented any evidence to support that contention.

"Maydak has unsuccessfully prosecuted numerous collateral attacks on the judgment since 1994," Hull wrote in an extradition request to Canadian authorities.

In June 1991, Maydak set up a company called Confidential Services of America on Cavitt Avenue in Trafford to secure a pay-per-call 900 line through AT&T.

People who called the Confidential Services line, at $33.33 per call, heard a recording that told them how to set up their own 900 service.

But prosecutors said no consumers called the Confidential Services line -- only Maydak, his co-conspirator, Shawn P. Kovack, and others they recruited.

Maydak offered juveniles in Trafford $5 an hour for "racking phone calls" on the 900 line. He and Kovack traveled to out-of-the-way locations, including a truck stop in Oregon, to make calls.

Under a contract with Confidential Services, AT&T paid Maydak for the calls and billed the callers. But because the callers were fictitious names and companies set up by Maydak, there was no chance the phone company could collect.

AT&T had paid Maydak $550,000 by the time company officials were contacted by Trafford police and federal agents.

Maydak showed a touch of humor in the scheme. He used the aliases Richard Fibb, Cutlass Calais, Daniel Quayle and Mr. O. North to obtain credit calling cards from AT&T. He also got calling cards for several companies he set up, including Mr. Gickle's Pickle Farm.

But, he says, the government's case was all a lie.

"What they claimed I did is physically impossible to do," he said. "They said I made 43,000 phone calls from a truck stop in Oregon."

Maydak's parents, William and Christine Maydak, who run Chrissy's News Service in North Versailles, still think their son was the victim of a vast conspiracy.

The couple and one of Maydak's friends, Michael Sussman, who operates the Keith Maydak Foundation, have filed court papers of their own, accusing federal marshals of violating their civil rights in the search for Maydak in 2001.

Brainy convict back in town

"They're retaliating against anyone who knows him," Sussman said. "They have used every tactic possible to threaten his friends and associates."

The marshals are investigating Sussman and Christine Maydak for harboring a fugitive, according to court records.

Christine Maydak said Friday that she didn't want to answer questions "over the phone" and referred any queries to her son.

## On the lam

Maydak's fugitive run began in 2001. It started when he filed a petition from prison for Bloch to clarify the definition of "excessive drinking," which he wasn't allowed to do when he got out.

Bloch ruled that Maydak could not drink at all. Maydak appealed and a hearing was arranged. In the meantime, prosecutors learned that Pittsburgh police had arrested Maydak a few weeks earlier for drunken driving in Riverfront Park on the South Side.

Maydak says he wasn't driving, but police said he drove his van onto the gravel bed of a railroad line, then got out stumbling. Police took him to the hospital for a sobriety test, where they said he caused a fuss.

"He was loud, disruptive and belligerent to the officers, patients and hospital staff," Hull wrote. "Maydak shouted at the hospital staff that he was 'DUI' and on every street drug known to man."

The charge meant Maydak was in violation of his federal probation. When he didn't show up at his hearing Sept. 27, 2001, Bloch signed a bench warrant and the U.S. marshals began looking for him.

Maydak says the marshals were really after him because Bloch was still angry at the lawsuit served at his house, even though it was thrown out. In addition to the probation violation, a marshals wanted poster indicates Maydak had made an "inappropriate communication" with a federal judge. It called Maydak "armed and dangerous."

Maydak says he was never notified of the probation violation hearing.

At any rate, he left Western Pennsylvania, traveled the country and ended up in Canada, where he was joined by his wife, a Polish national named Malgorzata Duszak. The two had married in the South Hills on Sept. 10, 2001, but Duszak returned to Poland after Maydak got into more trouble in Canada.

On Sept. 29, 2002, two constables on patrol in a known drug area of Vancouver spotted Maydak's Dodge Spirit and followed it to a parking garage. He jumped out and "approached the officers, demanding to know why he was being followed," according to court papers.

He produced an Ohio driver's license in the name of Randy Angra Mamyu, but the officers ran his plate and realized he was wanted in the United States. Immigration authorities later charged him with entering the country illegally.

He's been in jail ever since, fighting extradition every step of the way and accusing Canadian authorities of improper conduct in eventually granting the U.S. extradition request.

In one court filing, Maydak said the Canadian minister of justice "based his decision on an erroneous finding of fact that he made in a perverse and capricious manner."

# EXHIBIT 2

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 04-4436

_____

KEITH MAYDAK,
                              Appellant,

v.

UNITED STATES DEPARTMENT OF EDUCATION;
BUREAU OF CITIZENSHIP & IMMIGRATION;
UNITED STATES POSTAL SERVICE;
TRANSPORTATION SECURITY ADMINISTRATION;
UNITED STATES DEPARTMENT OF TRANSPORTATION;
UNITED STATES DEPARTMENT OF JUSTICE

_____

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civ. No. 03-cv-01091)
District Judge: Honorable Alan N. Bloch

_____

Submitted Under Third Circuit LAR 34.1(a)
August 12, 2005

Before:  ALITO, SMITH and COWEN, <u>Circuit</u> <u>Judges</u>

(Filed: September 21, 2005)

_____

OPINION

_____

PER CURIAM

Appellant Keith Maydak was arrested in August 2001 by Pittsburgh police for driving under the influence and other motor vehicle violations. He was on supervised release at the time as a result of his conviction in a prior criminal action. In September 2001, the United States Probation Office filed a Petition on Supervised Release, contending that Maydak had violated the standard conditions of supervised release. Maydak was ordered to appear for a hearing on September 27, 2001, and when he failed to appear, the District Court ordered his arrest. On September 29, 2002, Maydak was arrested in Canada by Canadian authorities. In October 2002, the Probation Office filed a supplemental petition, contending that Maydak had violated various additional conditions of his supervised release. On or about October 29, 2004, Maydak was surrendered by Canada after contesting extradition.

While Maydak was in Canada, he filed suit against six United States agencies under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, in United States District Court for the Western District of Pennsylvania, the same court from which he had fled. The complaint describes Maydak's unsuccessful attempts to obtain a vast and disparate assortment of records, including records from the Department of Education concerning its lawsuit against him for defaulting on a student loan more than 10 years ago, the Department of Homeland Security concerning the legality of Malgorzata Duszak's status in this country, and the Department of Justice concerning its "no fly lists," among many

2

others. The government moved to dismiss the complaint under the fugitive disentitlement doctrine, or, alternatively, for failure to exhaust administrative remedies.

In an order entered on September 29, 2004, the District Court dismissed the action under the fugitive disentitlement doctrine pursuant to its inherent authority. The court reasoned that Maydak's flight to Canada was in complete disregard of its authority to adjudicate the supervised release violations, and it viewed the FOIA lawsuit as an indignity under the circumstances, noting Maydak's "contemptuous disrespect." See Ortega-Rodriguez v. United States, 507 U.S. 234 (1993); Molinaro v. New Jersey, 396 U.S. 365 (1970). The court reviewed the information sought and found a connection between Maydak's FOIA case and his status as a fugitive, Ortega-Rodriguez, 507 U.S. at 246, the connection being a further desire to evade law enforcement by investigating if and how he could depart from the United States again via air travel if released by Canadian authorities. Maydak appeals.

We will affirm. Although courts have authority to dismiss the direct appeal of a criminal fugitive who remains at large after escaping custody,[1] the fugitive disentitlement doctrine does not automatically disqualify a criminal fugitive from maintaining a civil action in federal court. In Degen v. United States, 517 U.S. 820 (1996), the Supreme Court held that a district court could not apply the fugitive disentitlement doctrine to

---

[1] In Ortega-Rodriguez, 507 U.S. 234, the Supreme Court rejected use of the doctrine against a defendant to dismiss an appeal when the defendant who had escaped during the district court proceedings was in custody during the appeal.

3

sanction a fugitive who had fled from the court's jurisdiction in a criminal case by refusing to accept his answer in a related civil forfeiture action. The Court emphasized that the fugitive defendant had a constitutional right to defend his property and that to strike his filings would be an excessive response to the concerns raised. <u>Id.</u> at 828. Several courts have observed that, with respect to the fugitive disentitlement doctrine, <u>Degen</u> shifted the emphasis in civil cases from considerations of dignity and deterrence to practical considerations such as enforceability and prejudice. <u>See</u>, <u>e.g.</u> <u>Sarland v. Anderson</u>, 205 F.3d 973, 974-75 (7th Cir. 2000).

Nevertheless, <u>Degen</u> does not operate as an absolute bar to applying the fugitive disentitlement doctrine in a civil case on the ground that the criminal fugitive's flight operates as an affront to the dignity of the court. <u>See</u> <u>Marran v. Marran</u>, 376 F.3d 143, 149 (3d Cir. 2004). In <u>Marran</u>, we held that a mother's purported status as a fugitive did not warrant dismissal of her federal appeal in a civil rights case under the doctrine. The mother had been held in contempt by a state court, and state criminal charges had been filed against her in connection with her refusal to produce her daughter under a custody order. <u>Id.</u> at 148-49. In rejecting a motion to dismiss the appeal on the basis of the doctrine, we did not reject the dignitary rationale out of hand; we simply noted that "the affront was to the dignity of the Pennsylvania courts, not to this Court." <u>Id.</u> at 149. <u>See also</u> <u>United States v. Awadalla</u>, 357 F.3d 243, 246 (2d Cir. 2004) (<u>Degen's</u> rationale for discounting dignity as relevant factor in civil case is that criminal defendant should not be

4

sanctioned by one court for his affront to another court).

The District Court's decision to apply the doctrine to Maydak's FOIA action was not an abuse of discretion. See Bagwell v. Dretke, 376 F.3d 408, 413 (5th Cir. 2004) (discussing proper standard of review). Maydak was not returned to the District Court's custody until a month after his FOIA case was dismissed, and prior to his return, he contested extradition. Thus, he was indeed a fugitive. Furthermore, dismissal did not interfere with Maydak fully exercising his rights under the U.S.-Canada Extradition Treaty. The federal contempt case initiated against him when he fled the jurisdiction was dismissed as a result of the terms of the extradition treaty. In addition, there was enough of a connection between Maydak's fugitive status and his FOIA case to justify application of the doctrine, Ortega-Rodriguez, 507 U.S. at 246, as explained by the District Court.

Finally, the sanction was not excessively harsh or extreme. Degen, 517 U.S. at 829; Bagwell, 376 F.3d at 414. It is the purpose of the Freedom of Information Act to promote accountability by opening the actions of government officials to public scrutiny. See McDonnell v. United States, 4 F.3d 1227, 1251 (3d Cir. 1993). Courts are available to enforce the rights established by the statute. However, the District Court's application of the doctrine to bar suit in the Western District was not excessively harsh insofar as Maydak could have filed his FOIA action in United States District Court for the District of Columbia, where he has filed other FOIA actions. 5 U.S.C. § 552(a)(4)(B) (West Supp. 2004). He did not need to file his action in the court from which he fled. The

dismissal with prejudice means that Maydak may not seek to reinstate this action in the Western District even though he no longer is a fugitive, but the District Court for the District of Columbia, not having been flouted, might well determine that dismissal in the Western District of Pennsylvania, under the District Court's inherent authority to control the proceedings before it, does not operate as a bar to suit in the District of Columbia (an issue we leave to that able court).

We will affirm the order of the District Court dismissing the case with prejudice.

# EXHIBIT 3

08 Feb 2007 4:22PM   FAX

DATE:      February 8, 2007

FROM:      K. Maydak
           M. Duszak

TO:        Sam Israel, Esq.

RE:        Duszak v. Rosenman, 07cv0009

                 FOR SETTLEMENT PURPOSES ONLY, NOT TO BE FILED OR
USED AS AN EXHIBIT

                 M. Duszak authorizes me to speak to you pertaining to this suit.  If you
wish to discuss resolving the matter, feel free to call.  However, if your intention is to
gather information or attempt to intimidate, propound a discovery request on the plaintiff.

                 The answer or motion to dismiss is due on Monday, February 12, 2007, as
to the corporation.  It is due on the 14th as to Windsor, Fauzie, Cosmos, and Trafalgar.

                 The Court did not yet join Dan Burgess, and a motion is being prepared to
add Mr. Hayter to the suit.

                 You are not admitted in Delaware as an attorney and you have not sought
*pro hac vice* status.

# EXHIBIT 4

## EXHIBIT A – TEXT OF CONVERSATION WITH EDWARD HAYTER ON DECEMBER 27, 2006

Call originated by Edward Hayter to telephone number 888-546-2320.
Answered in Panama City, Panama, by Keith Maydak.

CONVERSATION WITH EDWARD HAYTER
12-27-2006

CALLER: Hello. How may i help u?

EDWARD HAYTER: Mal Duszak, please

KEITH MAYDAK: Hello. This is Mal Duszak.

EDWARD HAYTER: Ok, Mr Duszak. This is Edward Hayter returning your call. What can I do for you please?

KEITH MAYDAK: Yes, I wanted to know. I wanted you to verify. wanted to hear from you before i filed the lawsuit. I just filed a lawsuit against Computershare regarding First Guardian Financial Group which I have been told you have nothing to do with. But, my concern is we tracked down Edward A. Rosenman who seems to work for you at a restaurant. Yet, we have press releases saying that you have no affliation with him

EDWARD HAYTER: I don't know what you are talking about. Quite frankly, I don't know "clears throat" what this is pertaining to. What is this pertaining to?

KEITH MAYDAK: First Guardian Financial Group

EDWARD HAYTER: Who who are you? I'm sorry. I don't mean to act disrespectfully but I don't know who I am talking to

KEITH MAYDAK: I am a shareholder

EDWARD HAYTER: Ok. Are you a shareholder in my company?

KEITH MAYDAK: No. First Guardian Financial

EDWARD HAYTER: Ok. So why are you calling me then?

KEITH MAYDAK: Well, I'm calling you because uh First Guardian Financial was sold allegedly sold by you to for controlling interest to an Abraham Rosenman

EDWARD HAYTER: Ok so. What is the problem is the question?

KEITH MAYDAK: The problem is the Edward A. Rosenman, which is the only E A Rosenman in the United States appears to be your general manager for your restaurant down in Florida.

EDWARD HAYTER: And? I still don't get your question. Are you implying... I don't get your inference here I'm not understanding what you are asking me.

KEITH MAYDAK: Well, I'm trying to determine verify that the person who works for you down in Florida as a restaurant manager, a 29-year old gentleman, who when I spoke with lied about his middle name saying it

# EXHIBIT 5

Mal Duszak (MD 5063)
Ul. Chopina 2a/4
Elblag   82-300   Poland

mailing:

613 Cross Street
East McKeesport, PA  15035
(888) 546-2320   Telephone
(800) 572-4403   Facsimile

RESPONDENT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
In re:

                                        CV 07-799

Subpoena dated February 7,
to Edward W. Hayter.

        EDWARD W. HAYTER,               DECLARATION OF MAL
                                        DUSZAK

                Petitioner.
------------------------------X

    I, Mal Duszak, declare under the penalty of the laws of the United States of

America for perjury that the following information is true and correct to the best of my

knowledge, information, and belief (28 USC 1746):

1    My name is Mal Duszak  I reside at Ul. Chopina, Suite 2a/4, Elblag, Poland.

     Because mail takes approximately three weeks to reach Poland, for business

     activities in the United States, I often use the address of my husband, Keith

     Maydak, which is 613 Cross Street, East McKeesport, Pennsylvania 15035. I

     am a citizen of Poland

2    I filed this lawsuit against First Guardian Financial Corp. and its affiliate

     companies in connection with a stock "pump and dump" where the defendants

     issued press releases claiming they were reducing their shares through a

"buyback" program when, in reality, they were issuing millions of new shares
_See_ Exhibit A (press releases). At the times I bought the shares, the
defendants had an authorized share count of 152,000,000 for the company.
_See_ Exhibit B

3. However, according to Computershare, a licensed stock transfer agent, First
Guardian Financial Corporation issued millions of shares in excess of that.

4. The crux of my action is that I invested over $35,000 and received counterfeit
shares, and that as a result of the defendants' false representations, the value
of the shares plummeted.

5. A copy of my Complaint was attached to the declaration of Edward Hayter
filed in this case and describes the action.

6. During the pump and dump scheme, the defendants issued various press
releases using the name "Abraham Rosenman," who was purportedly the
President of First Guardian Financial Corporation. _See_ Exhibit A.

7. I ultimately reviewed a newspaper article reviewing a restaurant in Florida,
revealed that "Abraham Rosenman" was, in reality, Edward A. Rosenman, an
employee of a company called IBAC Corporation controlled by Edward
Hayter.

8. Yet, a press release from FGFC asserted that Mr. Hayter had no involvement
with the Company. _See_ Exhibit C.

9. My husband made a pretext call to Mr. Hayter in December 2006. In that
pretext call, which I authorized, he stated that he was me and asked Mr.
Hayter to return his call. Eventually, Mr. Hayter called a toll-free number that

announces that the call may be recorded. Maydak spoke to Mr. Hayter. A copy of the transcript is attached to the Declaration of Keith Maydak filed herewith. Mr. Hayter claimed that he had no involvement in FGFC and sold his interest to third parties.

10. In my lawsuit, I did not sue Mr. Hayter. I believed that Mr. Hayter was being forthright when he advised that he did not have involvement in the scheme. In fact, from listening to the telephone recording, I believed that Mr. Hayter was an honest man and I chose to invest into his company, IBAC Corporation.

11. However, from the tape recording, I learned that Mr. Hayter knew the identity of the persons he sold his controlling interest in the company.

12. Since Mr. Rosenman was nothing but a restaurant employee, I needed to discover who Mr. Hayter sold control to so I could join the correct parties in my lawsuit.

13. I issued a subpoena to Mr. Hayter not to discover information in the lawsuit, but to learn the identities of the defendants I sued as John Doe.

14. I did ultimately file a motion to join Mr. Hayter in the case because the Secretary of the State of Delaware provided me documents showing that as recently as July 2006, Mr. Hayter signed documents on behalf of FGFC. *See* Exhibit B. Receiving the documents from the Secretary of State was the first time I learned that Mr. Hayter lied about his involvement in FGFC.

15. But most likely there are additional parties involved who will be identified by the documents that are being sought from Mr. Hayter pursuant to the subpoena.

16. At the time the subpoena was issued, I did not know Mr Hayter would be a party as I did not see the Secretary of State documents

17. I have reviewed the documents executed by Mr. Hayter and his lawyer, Sam Israel.

18. As to the telephone calls in question, I refer the Court to the Declaration of Keith Maydak

19. However, as to the inferences that I did not file this suit, the allegations are false.

20. I have signed the documents in question in accordance with Federal Rule of Civil Procedure 11. The Complaint is verified under 28 USC §1746.

21. The fact that my husband has litigation experience and, jointly along with me, sent a fax to Mr Israel, does not equate to my husband "representing me."

22. Of course, my husband has assisted me with my legal case and we have gone over the facts of this case together, but he does not "represent" me.

23. I have litigated cases before in both state and federal courts.

24. As to the claims made by Mr Hayter's counsel that I filed this case to somehow extort a settlement, I invested approximately $35,000 in the FGFC pump and dump scam based on myriad press releases claiming that million dollar deals were occurring and that the company made over $1,000,000 profit on a land deal in Canada, among other things

25. My lawsuit outlines the misleading press releases that were occurring, and I believe that my allegations state a *prima facie* case of stock fraud

26  As to the request that I be enjoined from issuing any discovery unless I appear

by counsel or personally show up to Court, such a request is unheard of.  My

documents are signed pursuant to 28 USC §1746

27  I have reviewed legal pleadings filed in the Western District of Missouri.  *See*

Exhibit D.  In that case, Mr. Israel purports to represent all of the defendants

in this case, apparently including Edward A. Rosenman.  However, in

reviewing the conversation with Mr. Hayter, it appears that he has the

conflicting position that Edward A. Rosenman acted without his involvement.

Dated this 26th day of February, 2007

_____

Mal Duszak

# EXHIBIT 6

Mal Duszak (MD 5063)
Ul. Chopina 2a/4
Elblag   82-300  Poland

mailing:

613 Cross Street
East McKeesport, PA  15035
(888) 546-2320  Telephone
(800) 572-4403  Facsimile

RESPONDENT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
In re:
                                    CV 07-799

Subpoena dated February 7,
to Edward W. Hayter.

      EDWARD W. HAYTER,           DECLARATION OF KEITH
                                  MAYDAK
            Petitioner.
------------------------------X

I, Keith Maydak, declare under the penalty of the laws of the United States of

America for perjury that the following information is true and correct to the best of my

knowledge, information, and belief (28 USC 1746):

1   My name is Keith Maydak  I reside in Panama City, Panama, and in other

    locations near that area

2   I am lawfully married to the plaintiff, Mal  Duszak.

3   However, I did not sign any legal pleading on her behalf. She signs her own

    documents.

4   Of course, I help her with formatting her pleadings and correcting her grammar, I

    also provide her with copies of cases to read

5   I have reviewed the Declaration of Sam Israel. Mr. Israel misrepresents the
    conversation that occurred with him. Specifically, on February 8, 2007, Mr.
    Israel called me. I answered the telephone, "Hello, may I help you?" Mr. Israel
    said, "Hi. Keith Maydak please." When I identified myself as Keith Maydak,
    Mr. Israel asked, "Umm, are you the plaintiff in a lawsuit against Edward
    Rosenman?" I informed Mr. Israel that I was not. Mr. Israel asked me who the
    plaintiff was. I told Mr. Israel that the plaintiff is listed in the caption of the
    lawsuit. I did inform Mr. Israel that my wife authorized me to speak with him.
    At that time, Mr. Israel went into a tirade that I was practicing law without a
    license. I told Mr. Israel that my wife signed every one of her legal pleadings
    under Rule 11. Mr. Israel stated he represented the defendants in the lawsuit, but
    would not identify which defendants in the lawsuit he represented. Mr. Israel
    asked me to fax him evidence that my wife made the investments in question.
    After my conversation, I discussed the conversation with my wife and she
    instructed me to send Mr. Israel copies of the stock purchases. She also instructed
    me to draft a joint letter from both of us with the language that Mr. Israel attached
    as an exhibit. I did so and Mr. Israel attached it to his affidavit.

6   I have reviewed the Declaration of Edward Hayter. Mr. Hayter is correct that I
    made a pretext telephone call to him in December 2006 and that, when he
    returned the call on a telephone number that announced it may be recorded, I
    advised him that I was Mal Duszak and engaged in a dialogue with him.

7   Pretext telephone calls are a routine investigatory tool used by both private
    investigators and law enforcement agencies to obtain information.

8.  In this case, I had the permission of my wife before I made the call and I made no material misrepresentation to Mr. Hayter in the course of the pretext call except that I identified myself as my wife.

9.  A true copy of the text of the conversation is attached hereto as Exhibit A.

10. The conversation indicates that Mr. Hayter had no control over FGFC and did not know much about the company.

11. Yet, according to the documents from the Delaware Secretary of State, Mr. Hayter was the President and CEO in July 2006, which is after they allegedly started the "buyback."

12. I have read Mr. Israel's affidavit inferring that I am a professional litigant.

13. The majority of the cases I have recently prosecuted have been against government agencies involving requests for information and records under the Freedom of Information Act.

14. Contrary to counsel's claim that I sue to force settlements with vulnerable persons, I have only settled one lawsuit over the last two years. That lawsuit was against the United States under the Federal Tort Claims Act in the Northern District of New York wherein United States District Judge David Hurd approved a settlement of $9,750.00 to me by the Government. *Maydak v. Christine*, 98cv1186(N.D.N.Y.).

15. Finally, Mr. Israel called me a "known fraudster." I was convicted in 1993 for an alleged fraud offense involving AT&T stemming from a 1991 contract. That is my only criminal conviction. That incident occurred over fifteen (15) years ago

and does not, somehow, grant *carteblanche* to Mr. Hayter and the other defendants to defraud retail investors.

16. Apparently, Mr. Israel's defense for his client is to attack the messenger rather than to defend against the allegations in the instant lawsuit.

17. At no point in Mr. Israel's documents does he assert that the allegations that his clients defrauded investors is false.

18. I had two conversations with Edward Rosenman, a defendant in the lawsuit. During the first conversation, Mr. Rosenman represented to me that he never heard of First Guardian Financial Corporation. During the second conversation, Mr. Rosenman advised me that he acted for Mr. Hayter at all times material and did not author the press releases in question.

Dated this 26th day of February, 2007.

_____

Keith Maydak

**EXHIBIT 7**

**ABC Agents, Inc.**
*legal support services and corporate agents*
ph: 888-554-7185  email:  service@abcagents.net
613 Cross Street
East McKeesport, PA  15035-1307

Mal Duszak
613 Cross Street
East McKeesport, PA 15035